# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATHMARK STORES, INC.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **GATOR MONUMENT PARTNERS, LLP,** | : | |
| **Defendant.** | : | **NO. 08-3082** |

### <u>MEMORANDUM</u>

GENE E.K. PRATTER, District Judge                                    DECEMBER 21, 2009

In this case, the Court is called upon to interpret a lease for real property entered into in 1980 by the parties' predecessors-in-interest. This task is made significantly easier by an undisputed, 28 year-long course of performance that clarifies the meaning of now disputed provisions. Repeated actions performed under a contact are powerful evidence of its meaning.

In 1980, Pathmark Stores, Inc.'s predecessor-in-interest and Gator Monument Partners, LLP's predecessor-in-interest entered into lease agreement for Pathmark to occupy space in a particular shopping center. In May 2008, Gator notified Pathmark that it was terminating the lease because of various alleged defaults, and Pathmark subsequently filed this lawsuit. Pathmark's Complaint seeks (i) injunctive relief to prevent Gator from taking possession of the property and terminating the lease, and (ii) a declaratory judgment that Pathmark is not in violation of the lease, the lease is not terminated, Pathmark has no obligation to vacate the premises, and Pathmark does not owe Gator any additional rent from various subleases. The Complaint also alleges that Gator breached the lease. Gator counterclaims that Pathmark is in default under the lease for (i) failing to request the landlord's consent for subleases; (ii) failing to

maintain the property in good repair and condition; (iii) failing to pay sublease revenue to the landlord; and (iv) failing to pay the correct amount of rent.

Both parties now move for summary judgment. Pathmark seeks summary judgment on all counts in its Complaint and Gator's Counterclaims. Gator seeks partial summary judgment on its counterclaim that it is entitled to sublease revenue collected by Pathmark. For the reasons discussed below, the Court will grant in part and deny in part Pathmark's Motion for Summary Judgment, and the Court will deny Gator's Motion for Partial Summary Judgment.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

On November 1, 1980, Supermarkets General Corporation (currently known as Pathmark)[2] entered into a lease (the "Lease") with Gator's predecessor-in-interest, Superline Associates Limited Partnership for a shopping center consisting of approximately seven acres of land, with improvements, located at Conshohocken Avenue and Monument Road in Philadelphia, Pennsylvania (the "Property"). (Pl.'s Ex. A, Lease Agreement between Superline Associates Limited Partnership and Supermarkets General Corporation.) Superline Associates Limited

---

[1] The facts are undisputed unless expressly noted. Where there is a factual dispute, as long as the non-moving party has record support for its position, the facts are viewed in the light most favorable to it.

[2] Gator seemingly denies that Pathmark and Supermarkets General Corporation are related, but offers no evidence in support of this denial. In fact, Gator's contention is belied by its very own Purchase Agreement for the Property, in which Gator acquired "[a]ll of Seller's right, title and interest, as lessor in and to the Lease Agreement dated as of November 1, 1980 by and between Superline, as lessor, and *Pathmark Stores, Inc., a Delaware corporation, formerly known as Supermarkets General Corporation, as lessee . . . .*" (Pl.'s Ex. G ¶ 1.1(c) (emphasis added)). In any event, any dispute about this issue is immaterial, given that Gator does not argue that Pathmark is currently in wrongful possession of the property, or that the rights and obligations under the Lease changed as a result of its assignment.

Partnership subsequently assigned its interest in the Lease to Newkirk Superline, L.P. ("Superline"). On April 3, 2008, Newkirk Superline assigned its interest in the Lease to Gator Monument Partners, LLP ("Gator"), the present landlord. (Pl.'s Ex. B, Assignment and Assumption of Lease Agreement.)

The shopping center is comprised of 6.615 acres of land and at least 75,983 square feet of improvements. The supermarket space, now comprised of approximately 56,243 square feet, was enlarged by approximately 5,140 square feet in 1990. (Def.'s Supplemental Appendix at 255-57.) The retail space has been subleased from time to time since the inception of the Lease. Pathmark currently subleases seven units. (Pl.'s Ex. E, Subtenant Rent Roll.)

The Lease is comprised of a Primary Term and an Extended Term. The Primary Term commenced on November 26, 1980 and ended on November 30, 2005. (Pl.'s Ex. A ¶ 3, Schedule B.) The Extended Term then began, with an option for up to six consecutive Extended Terms, each of an additional five years, with the Lease permanently terminating on November 30, 2035. (Pl.'s Ex. A ¶ 3, Schedule B.) Pathmark currently occupies the premises under an Extended Term of the Lease that began on December 1, 2005.

**A.**     **Relevant Lease Provisions and the Performance Under These Provisions**

**i.**     **Payments of Rent**

Schedule B of the Lease sets forth the Basic Rent owed during the Primary and Extended Terms. For example, from 1995 to present, the Basic Rent is calculated as follows:

> 5.     Each instalment [sic] of the Basic Rent payable for the Premises during the term of this Lease commencing on December 1, 1995 and ending on and including November 30, 2005 is **$60,375.66** ($22,562.20 for the Land and $37,813.46 for the Improvements) . . . . The fixed rent per square foot during this period is **$0.0783** for the Land and **$0.5294** for the Improvements.

6.    Each instalment [sic] of the Basic Rent payable for the Premises during each Extended Term is **$33,671.77** ($12,583.04 for the Land and $21,088.73 for the Improvement) . . . . The fixed rent per square foot during this period is **$0.0437** for the land and **$.2952** for the Improvements.

(Pl.'s Ex. A, Schedule B (emphasis added))

During the Primary and Extended Terms, Pathmark paid Superline the lump sums in rent specified in Schedule B, without any calculation based on the fixed rent per square foot. (See, Pl.'s Ex. D, Declaration of Joanne Grossman ¶ 7).[3]

### ii.    Sharing of Sublease Revenue and Consent for Subleases

During the Primary Term, the tenant was not required to obtain consent from the landlord to sublet the property and the tenant had no obligation to share any sublease revenue with the landlord. During the Extended Term, however, the landlord's consent to a sublease is required, although if the landlord fails to either give or refuse consent within 30 days notice of a potential sublease, the landlord "shall be deemed to have consented to such sublease." (Pl.'s Ex. A ¶ 16.) With respect to revenue received from subtenants, the following provision is triggered during the Extended Term:

Notwithstanding Lessor's consent to any sublease for any portion of an Extended Term, Lessee shall continue to pay all Basic Rent and other sums then payable under this Lease and shall, upon Lessee's receipt of the rents and other payments pursuant to all the subleases, pay to Lessor an amount equal to the aggregate of all rents and other payments received from the sublessees in excess of the Basic Rent, additional rent and other amounts paid by Lessee under this Lease applicable to the period to which such payments

---

[3] Gator questions the accuracy and nature of these payments. Gator clams that Pathmark did not exist until after the bankruptcy of Supermarkets General Corporation and that Pathmark should be in possession of documents showing the amounts paid by Pathmark in rent. Gator also notes that the identity of the landlord changed when Superline assigned its interest in the Property to Newkirk Superline. Gator further claims that Pathmark failed for more than a year to pay installments of Basic Rent due for December 2007. (Gator Resp. ¶ 21.) However, Gator points to no evidence in the record to support these contentions.

apply.

(Pl.'s Ex. A ¶ 16(b)).

Pathmark currently has subleases with seven tenants.  (Pl.'s Ex. E.)  During the Extended

Term, Pathmark has not received any rent from subtenants in excess of the lump sums of Basic

Rent it has paid to the landlord for the entire premises.  (Pl.'s Ex. E.)[4]

### iii.    Condition of the Property

The Lease requires Pathmark to maintain the Property in good repair and condition.

Paragraph 9 of the Lease provides, in relevant part:

> Lessee, at its own expense, will maintain all parts of the Premises in good repair and
> condition, except for ordinary wear and tear, and will take all action and will make all
> structural and nonstructural, foreseen and unforeseen and ordinary and extraordinary
> changes and repairs which may be required to keep all parts of the Premises in good repair.

(Pl.'s Ex. A ¶ 9.)

### B.    **Gator's Purchase of the Property**

Gator purchased the Property from Superline on or about April 3, 2008.   (Pl.'s Ex. G,

Purchase Agreement.)  Under the Purchase Agreement, Gator acquired "[a]ll of Seller's right, title

and interest, as lessor in and to the Lease Agreement dated as of November 1, 1980 by and

between Superline, as lessor, and Pathmark Stores, Inc., a Delaware corporation, formerly known

as Supermarkets General Corporation, as lessee . . . ."  (Pl.'s Ex. G ¶ 1.1(c).)  In this agreement,

the Seller represented that it had "no knowledge of any monetary defaults by the Lessess under the

---

[4] Gator contends that there is no evidence that the previous landlord was aware of the
lease requirements for payment of sublease profit, or of the subtenants occupying the premises.
In contrast, Pathmark contends that the previous landlord knew of the relevant provisions and
subtenants, and that the record is devoid of any objections by the previous landlord to subleases
entered into by Pathmark.   These issues are addressed below.

Lease." (Pl.'s Ex. G ¶ 4.1(c).) In connection with the sale, Pathmark executed and delivered to Gator a Lessee Estoppel Certificate, which stated that "[t]he fixed annual or base rent currently payable under the Lease is $404,061.24 per annum payable in arrears in fixed monthly installments of $33,671.77 each per month . . . ." (Pl.'s Ex. I, Lessee Estoppel Certificate.)

Gator financed its acquisition of the Property through a Loan Agreement with Bank of America dated April 2, 2008. In this Loan Agreement, Gator represented that the Property "is in good condition, order and repair, there exist no structural or other defects in such Mortgaged Property (whether patent or, to the best knowledge of the relevant Borrower, latent or otherwise)." (Pl.'s Ex. J, Loan Agreement ¶ 3.13(f).)

### C.  Communications between the Parties Regarding the Lease

On May 8, 2008, Gator sent Pathmark a default notice, claiming that Pathmark was in default of the Lease for failing to remit sublease profit to Gator for the Extended Term. (Pl.'s Ex. K.) Two weeks later, Pathmark responded by denying Gator's claims, (Pl.'s Ex. F.), and on May 29, 2008, Gator provided an additional notice of termination to Pathmark, alleging that Pathmark failed to cure the default caused by its failure to pay sublease profit. (Pl.'s Ex. L.) On June 24, 2008, Gator sent to Pathmark a "Supplementary Notice of Default," contending that Gator had grounds to terminate the Lease because: (i) Pathmark had failed to maintain the Property in good repair and condition "in that the Premises are generally dirty and in need of cleaning, and the curbing, sidewalks and car stops are in poor condition, as is the landscaping and parking lot, and parts of the Improvements are in need of painting"; (ii) Pathmark had subleased the Premises "without the prior written consent of Lessor"; and (iii) Pathmark had failed to pay "Lessor an amount equal to the aggregate of all rents and other payments received from the subleases in

excess of the Basic Rent, additional rent and other amounts paid by Lessee . . ."  (Pl.'s Ex. M.)

The following week, Pathmark initiated this litigation.  After a lengthy period of discovery, Pathmark moved for summary judgment, and Gator moved for partial summary judgment.  The court heard oral argument on the cross motions and permitted the parties to submit supplemental summary judgment briefs thereafter.

## II.    STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution could affect the result of the suit under governing law.  Id.

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.

Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. Celotex, 477 U.S. at 322-23. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

The same standards and burdens apply on cross motions for summary judgment. See Applemans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987); Peters Twp. Sch. Dist. v. Hartford Accident and Indem. Co., 833 F.2d 32, 34 (3d Cir. 1987). Cross motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waived judicial consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuella II Ca v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). Of course, when presented with cross motions for summary judgment, the Court must and does consider the motions separately. See Williams v. Phila. Hous. Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994).

## III.  DISCUSSION

### A.  Applicable Principles of Contract Interpretation

When a party moves for summary judgment and the issue is contract interpretation, the court will grant summary judgment if the contractual language is subject to only one reasonable interpretation.  Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 420-21 (3d Cir. 1999) (internal citation omitted).  If, on the other hand, the contractual language is ambiguous, then the "interpretation of that term is a question of fact for the trier of fact to resolve in light of the extrinsic evidence offered by the parties in support of their respective interpretations." Id. at 421.  Contractual language is ambiguous if it is subject to reasonable alternative interpretations. Id.  At the same time, "[a] contract is not rendered ambiguous by the mere fact that the parties do not agree upon its proper construction."  Riccio v. American Republic Ins. Co., 683 A.2d 1226, 1233 (Pa. Super Ct. 1996).

Pennsylvania law assumes the intent of the parties is embodied in the writing itself. Steuart v. McChesney, 444 A.2d 659, 661 (1982).  When contractual language is clear and unambiguous, there is no need to resort to extrinsic aids or evidence to discover the parties' intent. Id.  To decide whether contractual language is ambiguous, courts may consider, among other things, "the words of the contract, the alternative meanings suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning."  Sanford Inv. Co., 198 F.3d at 421 (internal citation and quotation omitted); see also Resolution Trust Corp. v. Urban Redevelopment Auth. of Pittsburgh, 638 A.2d 972, 975 (1994) (noting that when a contract seems ambiguous, "parol evidence is admissible to explain the agreement and resolve ambiguities to ascertain the meaning of the parties").

In addition, even when a contract seems unambiguous, a court may look to the course of the parties' performance in construing the contract. Prudential Ins. Co. of Am. v. Prusky, 413 F. Supp. 2d 489, 493-94 (E.D. Pa. 2005). Indeed, a court may look to the parties' course of conduct to determine whether a contract is ambiguous and/or to resolve an ambiguity. Id. at 494; see also In re Old Summit Mfg., LLC, 523 F.3d 134, 137 (3d Cir. 2008) ("[a] court always may consider the course of performance as evidence of the intent of the parties.") (citing Atlantic Richfield Co. v. Razumic, 390 A.2d 736, 741 n.6 (1978)). Sensibly articulated, the actual performance of the parties under a contract tends to "make definite that which was previously unclear." Greene v. Oliver Realty, Inc., 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987); Dahar v. Grzandziel, 599 A.2d 217, 220 (Pa. Super Ct. 1991) (same).

### i.    Basic Rent

Pathmark contends that because the Basic Rent is stated in exact lump sums in Schedule B of the Lease, the Lease is clear that Pathmark must always pay these lump sums in Basic Rent. Accordingly, Pathmark argues, as it must, that the mere inclusion of a price per square foot does not require recalculation of rent based on the size of the property at a given time.

In support of its position, Pathmark points to a lengthy course of performance under the Lease. Rent payments have always been paid and accepted according to only the lump sums set forth in Schedule B. Specifically, during the Primary Term, Pathmark paid the installments of Basic Rent without any reference to the square footage recitations in Schedule B. After 2005, when the Lease entered into the Extended Term, Pathmark continued to pay Basic Rent in lump sums. The record does not show that the previous landlord ever protested, disputed these lump sum payments, or recalculated the rent due based on the fixed rent per square foot figures.

Pathmark argues that this course of performance evidence is bolstered by documents and actions related to Gator's purchase of the property in 2008. Superline expressly represented and warranted in the Purchase Agreement with Gator that it (Superline) had no knowledge of any monetary defaults by Pathmark under the Lease. In addition, the Lessee Estoppel Certificate delivered by Pathmark to Gator in connection with the sale listed the rent as the lump sum of $33,671.77 per month.

Gator advances a different interpretation of Basic Rent as a per square foot concept, evidenced in the Lease by the specified amount of fixed rent per square foot for land and improvements. Gator argues that because the size of the supermarket was enlarged in 1990, the lump sums contained in Schedule B for the monthly installments of Basic Rent have been lower than the total rent owed on a square foot basis. As a result, Gator argues that Pathmark has underpaid Basic Rent during both the Primary and Extended Terms.

Gator acknowledges the lengthy course of performance under the Lease. (See Def.'s Supp. Summary Judgment Br. at 10 ("It is undisputed that Pathmark has paid the installments of Basic Rent set forth in the Schedule rather than the amount due if the additional space is included in the rent calculation.").) But Gator argues that the course of performance should be ignored because neither Pathmark nor Gator was an original party to the Lease, and they should not be bound by their assignors' conduct. In any event, Gator surmises that these lump sum payments were accepted by mistake by the previous landlords. Gator also contends that Pathmark's statements in the Lessee Estoppel Certificate regarding payment of Basic Rent do not bind Gator because an estoppel certificate only binds the person making it (Pathmark), not the person to whom it is made (Gator). For the same reason, Gator argues that the seller's representations that

11

it had no knowledge of any monetary defaults by Pathmark under the Lease at the time of sale were not binding on Gator.

On its face, Schedule B appears ambiguous with respect to the proper calculation of Basic Rent payments.  Although Schedule B provides for fixed monthly payments, it also denotes Basic Rent in very precise terms of price per square foot.  If the rent is simply the lump sums indicated in Schedule B, the inclusion of price per square foot would be superfluous and puzzlingly so if all there was to consider was the document alone.  Thus, the plain language of the contract is not entirely clear on how Basic Rent should be calculated.

Pathmark's interpretation of the Lease, however, is favored by some general principles of contract interpretation.  First, "where doubt arises out of the uncertainty as to the meaning of the language used in a lease, its provisions will be construed most strongly against the lessor and in favor of the lessee."  Kline v. Marianne Germantown Corp., 263 A.2d 362, 364 (1970).  Second, specific provisions in a contract are ordinarily regarded as qualifying the meaning of more general provisions with respect to the subject at issue.  Capitol Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973) ("[W]hile a contract's provisions must be interpreted with reference to the whole the specific controls the general").  Under this principle, the more specific overarching lump sum language in Schedule B would control over the broader, inexact square foot language and qualifies the latter's meaning.  Third, "[a] party who willingly and without protest enters into a contract with knowledge of the other party's interpretation of it is bound by such interpretations and cannot later claim that it thought something else was meant."  Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770, 775 (3d Cir. 1972); see also Sun Co. v. Pennsylvania Turnpike Comm'n, 708 A.2d 875, 880 (Pa. Commw. Ct. 1998) (applying this principle of contract

interpretation against a successor in interest to a lease). Here, Gator had knowledge of not only Pathmark's interpretation of the Basic Rent provision but also the prior landlords' (whose motivation to have collected as much rent as possible would seem clear), through Gator's due diligence prior to buying the Property and through the Lessee Estoppel Certificate and the seller's representations delivered to Gator.

Further, in considering whether a contract is truly ambiguous, a court may also consider the course of performance under the contract. As an initial matter, Gator contends that the course of performance should be ignored here because neither Pathmark nor its previous landlord was an original party to the Lease and only the conduct of the original parties is relevant to interpreting the meaning of the Lease.[5] Most courts, including at least one in this District, disagree with that view. See Getty Petroleum Mkgt. Inc. v. Shipley Fuels Mkgt. LLC, No. 07-340, 2007 WL 2844872, at *20 (E.D. Pa. Sept. 27, 2007) ("This construction is reinforced by the parties' course of performance. Every assignee of the Agreement prior to plaintiff Getty provided defendant Shipley with both Mobil brand petroleum products and Mobil trademarks."); Lafitte Co. v. United Fuel Gas Co., 177 F. Supp. 52, 60 (E.D. Ky. 1959) ("Not only is the conduct of the parties with respect to the matter of accepting the monthly royalty payments over a period of more than twenty five years significant, but it must be borne in mind that the lease was transferred on three different

---

[5] Gator relies on three out of state cases for the proposition that courts should only look to the course of performance of the original parties to a contract when interpreting a contract. See Boston & M.R.R. v. Peterborough R.R., 166 A. 275 (N.H. 1933); Cincinnati v. Cincinnati Gaslight & Coke Co., 41 N.E. 239 (Ohio 1895); Gendler Stone Prods. Co. v. Laub, 179 N.W.2d 628 (Iowa 1970). The Court does not find these cases persuasive to the extent they support Gator's argument because, as explained in this opinion, such a rule would lead to uncertainty every time a contract or lease is assigned. The more accepted view espoused by courts seems to be that course of performance by predecessors-in-interest to a contract is relevant in interpreting the meaning of a contract, especially when that course of performance is undisputed.

occasions. It is proper to assume that on each of these occasions the [provisions at issue] were taken into careful consideration by both the seller and the purchaser . . ."); Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., 178 F. Supp. 655, 668 (S.D.N.Y. 1959) ("The continued periodic payments and the affirmance of the obligation by plaintiff's predecessor long after the event upon which plaintiff relies occurred, is strong evidence that the obligation to pay still continues in force and effect . . ."). Indeed, Gator's conveniently narrow view of course of performance, taken to its logical conclusion, would have the undesirable results of rendering the course of performance doctrine meaningless every time a contract is assigned, inserting uncertainly into the meaning of contract every time it is assigned, and contradicting the general rule that an assignee stands in the shoes of an assignor. See Archer Daniels Midland Co. v. Brunswick County, N.C., 129 Fed. App'x 16, 25 (4th Cir. 2005) ("A contractual successor stands in its predecessor's shoes for both rights and responsibilities and-at least-a frank admission about the course of performance by an original party to the contract surely may be used against it by the successor. Were it any other way, it seems that the UCC's course of performance and waiver doctrines would be read out of existence whenever a contract for the sale of goods is assigned."). Therefore, the Court will analyze the course of performance under the Lease in determining the meaning of the Lease provisions at issue.

The course of performance in this case is undisputed: for over 28 years the landlord accepted rent payment based on the lump sums specified in Schedule B, not based on any per square foot formula. From 1990 until Gator purchased the property in 2008, no landlord had ever claimed that the tenant was paying less Basic Rent than required. Although the Lease Estoppel Certificate noting the lump sum to be paid in rent and Superline's representation that Pathmark

14

was not in default under the Lease certainly do not bar Gator's interpretation of Basic Rent as a matter of law, these documents provide further evidence of the lengthy course of performance and at least serve as evidence of Gator's knowledge of Pathmark's interpretation of Basic Rent. Gator's only rebuttal is to argue that when the supermarket space was expanded in 1990, the previous landlord may not have increased the Basic Rent because the issue "'fell between chairs'" and Superline accepted the payments by mistake. (Gator Opp. at 24.) It is simply not credible, nor is there any evidence in the record, to suggest that the previous landlords were unmotivated or asleep at the switch for 28 years.

General principles of contract interpretation and the lengthy, undisputed course of performance under the Lease make it clear that the Basic Rent is to be paid in the lump sums specified in Schedule B. Pathmark is entitled to summary judgment on this issue concerning rent payments.

### ii. Sharing of Sublease Revenue

During the Extended Term, Pathmark must pay the landlord "an amount equal to the aggregate of all rents and other payments received from the sublessees in excess of the Basic Rent, additional rent and other amounts paid by Lessee under this Lease applicable to the period to which such payments apply." (Pl.'s Ex. A ¶ 16(b).)

Pathmark contends that this provision, by its plain terms, refers to the total rents and other payments made by Pathmark to the landlord. Under Pathmark's interpretation, the landlord does not receive any sublease revenue until that revenue exceeds the value of Pathmark's total payments to the landlord under the Lease. Pathmark argues that this interpretation is logical because it ensures that: (1) Gator will always receive a minimum of the agreed-upon rent for the

15

premises, regardless of the occupancy of the premises; and (2) Pathmark cannot profit from

subleasing all or part of the premises for an amount over $33,617.77, the Basic Rent during the

Extended Term. Pathmark also argues that the course of performance under the Lease reinforces

its interpretation, because the sublease revenue has never exceeded the total amount of Basic Rent

paid by Pathmark to the landlord. (Pathmark Opp. Br. at 14-15.)

In contrast, Gator argues that this section of the Lease references only the amount of Basic

Rent paid by Pathmark for the space that is subject to the subleases. In other words, Gator

construes the Lease as requiring Pathmark to remit the excess of what it collects from the

subtenants over what it pays the landlord for the *subleased space* - not the *entire space*. Gator

claims that Pathmark's interpretation of the Lease is incorrect because, under Pathmark's

interpretation, it is virtually impossible for the landlord to ever receive a portion of the sublease

revenue.

Gator also argues that its interpretation is supported in the language of the disputed

provision because the words "all" or "aggregate" are used elsewhere in the same sentence, but are

omitted in front of the phrase "in excess of the Basic Rent," thereby confirming that Basic Rent

means the amount paid for the subleased space only.[6]

---

[6] Gator's argument can be illustrated by highlighting these words in the Lease:

> Notwithstanding Lessor's consent to any sublease for any portion of an Extended
> Term, Lessee shall continue to pay ***all*** Basic Rent and other sums then payable
> under this Lease and shall, upon Lessee's receipt of the rents and other payments
> pursuant to ***all*** the subleases, pay to Lessor an amount equal to the ***aggregate of
> all*** rents and other payments received from the sublessees ***in excess of the Basic
> Rent***, additional rent and other amounts paid by Lessee under this Lease
> applicable to the period to which such payments apply.

(Pl.'s Ex. A, ¶ 16(b) (emphasis added)).

Finally, Gator contends, again, that Pathmark's course of performance evidence should not be considered on this issue because neither Pathmark nor Gator was an original party to the Lease. Gator also argues that Pathmark has exaggerated its course of performance argument because the previous landlord did not have a right to share in sublease revenue until the beginning of the Extended Term in 2005.   With respect to the Extended Term, Gator argues that the landlord was not aware of the application of the provisions of paragraph 16(b) for payment of sublease profits because Superline "is a large net-lease landlord, and such provisions were likely overlooked." (Gator Opp. ¶ 35.)  Thus, Gator argues that the "conclusion to be drawn from the present record is not that the previous landlord was in accord with Pathmark's interpretation [of the sublease revenue provision], but that . . . the previous landlord put the lease in a drawer and had forgotten about the sublease revenue provision by the time that the first Extended Term began."[7] (Gator Reply at 6.)

The plain language of the Lease accords with Pathmark's interpretation.  In determining whether Pathmark owes the landlord sublease revenue, the Lease refers generally to the rent Pathmark pays, not specifically to the rent it pays for the part of the premises it subleases.  The Lease document lacks any suggestion that Pathmark remit the excess of what it collects from its

---

[7] Gator also argues that because Basic Rent is a square foot concept under the Lease, it requires a square foot comparison, i.e., amounts paid per square foot by the sublessees and amounts paid for the same area per square foot by Pathmark, not the amount paid by Pathmark for the entire shopping center.  As previously discussed, the Court is not persuaded that Basic Rent is a square foot concept under the Lease.  Further, even if Basic Rent is a square foot concept, that does not inescapably lead to the conclusion that the relevant comparison for sublease revenue purposes is the amounts paid per square foot by the sublessees and the amounts paid for that same area by Pathmark.  It is just as likely that the relevant comparison is between the amounts paid per square foot by the sublessees and the amount paid by Pathmark per square foot for the *entire* Property.

subtenants over what it pays the landlord for the subleased space.

Further, the record establishes a three-year course of performance in which Pathmark did not pay the landlord sublease revenue.[8]  And when Pathmark's prior landlord sold the Property and assigned the Lease to Gator in April 2008, it warranted and represented to Gator that it had no knowledge that Pathmark was in default with respect to any monetary payment.  Though the course of performance prior to 2005 is irrelevant in analyzing this issue, the course of performance since 2005 is instructive in interpreting the meaning of the Lease, especially since that course of performance is undisputed.

Both parties have moved for summary judgment on the issue of sublease revenue.  Gator's reading of paragraph 16(b) is not supported by the provision's plain language.  Gator's only counter to the course of performance evidence in the record is that Superline forgot that it was owed sublease revenue.[9]  Conjecture is not enough to support Gator's own motion for summary judgment or to overcome Pathmark's motion for summary judgment.  Thus, Gator's motion for summary judgment on this issue is denied, and Pathmark's motion is granted.

**B.**     **Consent for Subleases**

Gator contends that Pathmark has entered into subleases for portions of the current

---

[8] As discussed *supra*, such course of performance evidence is properly considered by the Court.

[9] It seems logical to interpret the Lease as allowing Pathmark to receive a benefit should it sublease the premises, up to the amount of its Basic Rent payments to the landlord, but not to profit from subleasing should the subtenant rent exceed that amount.  In this respect, Pathmark is an "anchor tenant." (See Oral Argument Tr. at 47:4-14.)  If Pathmark had to turn over any rent received in excess of what it pays for the subleased space, it would have no incentive to maximize the rent it charges subtenants; Pathmark would always just charge up to the rent it pays, leaving Gator without a profit every time.

Extended Term without the prior written consent of the landlord in breach of the Lease. (Gator Counterclaim ¶¶ 6-10.)  In support of this claim, Gator notes that although requested to do so during discovery, Pathmark failed to produce evidence that it requested Superline's consent to the current subleases, and that Pathmark's corporate designee testified that he had no knowledge of any request for consent.  (Def.'s Supplemental Appendix at 123.)

Pathmark points to evidence that it obtained consent for the subleases.  In connection with its sale of the Property and assignment of the Lease, the prior landlord warranted and represented to Gator that it had no knowledge of Pathmark being in default under the Lease, which supports the notion that Pathmark obtained permission of the previous landlord.  Moreover, the course of performance evidence in the record supports Pathmark's position, as subtenants occupied the premises under the Extended Term for three and a half years before this suit was commenced without evidence of any objection.

After months of discovery, Gator has no evidence that Pathmark failed to obtain consent for any of its current subtenants to occupy the premises.[10]  Gator cannot overcome summary judgment on this issue simply by lamenting the absence of documents.  See Finizie v. Peake, 548 F. Supp. 2d 171, 179 (E.D. Pa. 2008) ("Rule 56 does not allow a non-moving party to avoid summary judgment by positing the existence of documents it does not have, but instead requires the party opposing summary judgment to actually produce them").  As the non-moving party on this issue, the facts must be viewed and all reasonable inferences must be drawn in the light most favorable to Gator.  However, Gator has no record support for its position.  Gator has not gone

---

[10] The Court notes that despite arguing that it needs additional documents, Gator filed its own Motion for Partial Summary Judgment, and did not request an extension of the deadline for filing dispositive motions.

beyond its pleadings and demonstrated a genuine issue for trial.  Bald allegations of lack of

consent after the close of discovery, without any support in the record, cannot defeat Pathmark's

motion for summary judgment on this issue.[11]

### C.    Condition of the Property

Gator contends that Pathmark has breached the provision in the Lease requiring Pathmark

to maintain the Property in good repair and condition. Gator has identified extensive evidence in

the record, including experts' reports and photographs, detailing defects in the property.  For

example, one expert inspected the roof of the retail space, found evidence of physical damage and

deterioration, and recommended that the roof be replaced.  (Def.'s Supplemental Appendix,

Report of Michael McGonigle of Professional Roof Services.)  Another expert inspected the

property and found evidence of water infiltration, damp conditions and visible mold growth.

(Def.'s Supplemental Appendix, Report of Accredited Environmental Technologies, Inc.)  In

addition, there is evidence that the parking lot and services drives are in disrepair.  (Def.'s

Supplemental Appendix, Report of LandAmerica Assessment Corporation.)

In response, Pathmark primarily relies upon the April 3, 2008 loan agreement Gator

entered into with Bank of America to finance its purchase of the property, in which Gator

represented that the property "is in good condition, order and repair."  Although this letter

---

[11] On July 8, 2009, after summary judgment briefing was complete, Gator filed a Motion to Compel the Production of Documents, seeking (1) discovery from Pathmark's former landlords relating to Pathmark's payment of Basic Rent; (2) ongoing discovery about sublease revenue; (3) copies of Pathmark's insurance policies; and (4) discovery from Bank of America relating to an alleged pledge of the relevant lease.  By Memorandum (Docket No. 47) and Order (Docket No. 48) dated August 26, 2009, the Court denied Gator's Motion as untimely.  However, during a telephone conference with the Court on August 19, 2009, Pathmark agreed to supplement disclosures concerning sublease revenue and to provide Gator with a current certificate of insurance.

certainly supports Pathmark's position, Pathmark has cited no legal authority that would completely bar, as a matter of law, Gator's claim against Pathmark for failing to maintain the property based on a statement concerning the condition of the property in a loan agreement between Gator and Bank of America. Pathmark offers no real rebuttal to Gator's expert surveys.

In sum, Pathmark does not present evidence, through experts or otherwise, demonstrating the lack of any genuine issue of material fact with respect to the condition of the Property. Based on the record evidence, a jury could reasonably find that Pathmark failed to maintain the property in good repair and condition. As a result, Pathmark's motion for summary judgment on this issue must be denied.[12]

## IV.    CONCLUSION

For the reasons discussed above, the Court will grant in part and deny in part Pathmark's Motion for Summary Judgment. In addition, the Court will deny Gator's Partial Motion for Summary Judgment. An Order consistent with this Memorandum follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E. K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[12] In its supplemental summary judgment briefing, Pathmark for the first time proposes that even if it is not entitled to summary judgment on the property damage issue, the Court should rule that: (i) there has been no material breach of the Lease; (ii) the Lease remains in full force and effect; and (iii) repairs will be performed as agreed upon by the parties, with said agreement to be presented to the Court for approval in form of a Consent Order, with this action to be dismissed, but subject to the continuing jurisdiction of this Court should any further disputes arise in connection with the Lease. (Pathmark Supp. Summary Judgment Brief at 12.) Because the Court holds that there is a genuine issue of material fact as to the Property's condition, the Court denies Pathmark's proposal which, in any event, appears more appropriate as a basis for an amicable resolution for at least some of the issues in dispute.